2009 1274 Diamond Sawblades v. United States 2009 1274 Diamond Sawblades v We're going to pursue here. We'll hear first from Mr. Goldfeder, is that right? That's correct. And then from Mr. St. Charles for ten minutes, and then from Mr. Pickard for ten minutes, is that right? And then we will conclude with Ms. Fox, is that right, for rebuttal. Very well. Mr. Goldfeder, when you're ready. Thank you, Your Honors. Again, I'm Jared Goldfeder, here on behalf of Defendant Appellant Iwa Diamond. Your Honors, this appeal involves a situation in which the Court of International Trade exceeded its authority in the application of the substantial evidence standard of review to the Commission's original negative injury determination in the Diamond Sawblades anti-dumping investigation. Now, before I go into the application of the standard by the Court of International Trade, I want to first address why substantial evidence is the appropriate standard of review. DSMC has argued here that this Court should apply an abuse of discretion standard, rather than the substantial evidence standard when reviewing the Court of International Trade's remand order in DSMC 1. We submit, as does the Commission, that the abuse of discretion standard does not apply here. This Court, in cases such as Altex and Taiwan Semiconductor, has made clear that review for abuse of discretion is appropriate only where, and this is a quote, the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, unquote, and instead of performing a substantial evidence review, remands merely for additional explanation. But that's not what happened here. Could I suggest to you that there's another way of looking at what the Court of International Trade did here on the first remand determination that's a little different from the way that the parties have looked at it? It strikes me, in reading the Court of International Trade opinion, that what the Court of International Trade is saying is that he has a problem because the International Trade Commission has made a finding of attenuated competition, a word that he uses repeatedly throughout the opinion. I don't see that the International Trade Commission made any finding of attenuated competition. It made a finding of limited competition, and whether you regard the competition as limited or substantial is sort of a difference between a glass half empty and a glass half full. And so maybe the problem with the remand determination is that he's attributed to the ITC a finding of attenuated competition, attenuated meaning slight, that the ITC never made. Well, I mean, our biggest problem that we have with the Court of International Trade's determination is that, and I mentioned before about exceeding its authority and its review, rather than... Well, they've made a finding of attenuated competition the way he characterized it. Maybe there wouldn't be substantial evidence to support such a finding. But that's not the finding that the ITC made. Right. The Commission's finding was about limited competition where they looked at the data, and this was a complicated issue that was dealt with through extensive briefing and at the hearing, and what the Commission ultimately determined was that when you look at the volume and the prices of imports and the condition of the industry, what you see or what you don't see is a causal nexus between imports and the condition of the industry. And the Commission's finding was of limited competition because ultimately the Commission has to make a material injury finding, and material injury is injury that is not inconsequential or tangential. And the Commission, while recognizing that, yes, there was a large volume in imports and, yes, the prices of imports were well below the prices of domestic production, still what you saw was a very healthy industry throughout the period of investigation. Every Commissioner who looked at this issue determined, yes, presently this industry was not materially injured. Yeah, but if we're reviewing for substantial evidence, the question is, what finding is not supported by substantial evidence? So we have to first identify the finding that he said wasn't supported by substantial evidence. What, in your view, is the finding that he concluded wasn't supported by substantial evidence? And it is the limited competition finding because the role of the Court of International Trade, as this Court has said in Nippon-Steele in 2006, is not to make its own determination but rather to vet the determination that the Commission made. And there is a long line of cases where the Courts, this Court, the Supreme Court, has said when reviewing agency determinations, you look at the determination and see, not whether the Court would have come to a different conclusion, but rather whether the conclusion that the Commission or the agency came to was supported by the evidence. And what we see in DSMC 1 is the Court of International Trade, respectfully, didn't take the Commission's determination as it was. Rather, the Court took the data, did its own analysis, did its re-weighing, and said, I see different conclusions than what the Commission said. The Commission, when it looked at the competition issue as part of its causation analysis, said, you know, when we look at the conditions of competition, we see that competition is limited by three factors, by the differences in the diameters of the blades that imports sell versus U.S. producers, differences in the types of blades, and differences in the customers and the end-users to which the blades, the first sale is being made. And they looked at that as a totality, and instead of, and that's the decision that was made. And when you consider all these factors, they all work in combination to limit competition between imports and the U.S. producers. But when they got to the Court of International Trade, the Court didn't vet the determination based on that method. Rather, it took those three distinct issues and said, well, if I look at this issue in isolation, I don't find it to be supported by substantial evidence. And the Court stated that. When I look at the second issue, blade types, again, not supported by substantial evidence. And that's how the Court proceeded in reviewing this determination, not looking and saying, well, did the way in which the Commission analyzed it, was that even if I disagree and even if I would have looked at it differently, is it still supported on the record as it stands? And that's not what the Court of International Trade did. It's the same approach on the price effects analysis, which was a separate issue. You had a determination where the Commission was based its determination that there were not significant adverse price effects on a variety of different factors, which are detailed in the briefs. But in looking at it, the Court took issue with one very subsidiary observation that the Commission made and said, well, I'm not going to determine that. I find the price effects was not supported because I don't agree with this observation that the Commission made. But the law is well established that even if a court finds, the reviewing court finds that it disagrees or finds one subsidiary issue unfounded, if the determination as a whole is supported, then the Court should still affirm the agency's determination. Again, that's not what the Court of International Trade did here. Very well. My time is running out. Thank you, Mr. Goldater. We'll hear next from Mr. St. Charles, I think, next up. May it please the Court. I'm Charles St. Charles on behalf of the International Trade Commission. As we explained in our brief, the Commission believes that both the original negative determination and the affirmative determination on remand are supported by substantial evidence. Notwithstanding any analytical differences between the two decisions, each of the eight commissioners who addressed this case in either the original determination or remand found no present material injury. They differed only on the issue of threat. Both of these decisions are supported, but under the Court's precedent, the Court need not address the remand determination if it sustains the original one. I'd like to point out initially that we agree with the appellants, that this is a substantial evidence case. What do you understand that the Court of International Trade did the first time around? Why did the Court of International Trade find that there was a lack of substantial evidence? Is it because the Court of International Trade attributed an attenuation, attenuated competition finding to the Commission? Your Honor, I think that's an important issue. When you read the summary of what the Commission found, the Court summarizes our finding as one of limited competition, but for some reason when it reaches the analysis, it interjects this word, attenuated competition, and you're quite correct. That was not the finding. The finding was that competition was limited. Did you understand the Court to be using the word attenuated as a term of art to be distinguished from limited? The conclusion that it reached suggested it was looking at something other than simply whether competition was limited. I don't remember you making a point of this in your brief. We have a footnote saying that. Although we use the word limited, they use the word attenuated. You point that out, but I don't recall you drawing any conclusion as to the legal insufficiency of the trial court's determination based on that fact. No, we did not. It's just a passing observation that the court used a different word. Right. But it seemed it was applying the wrong standard and apparently justifying it in part by what it perceived as attenuated. There's a very odd remand on the blade's edge. What other finding did the Court of International Trade find that was not supported by substantial evidence other than the finding of attenuated competition? The other one was in the price effects context. We're putting that aside for now. In the market analysis. There were several prompts to the unsupported finding related to the limited. But I'm not sure that I read the Court of International Trade as saying that those subsidiary findings were incorrect other than the one admitted mistake, which was found to be harmless error. In other words, the Commission made various findings about the degree of competition in the larger sizes, the degree of competition in the lower sizes, the distribution, the different distribution, the different types of blades. Were any of those subsidiary findings found to be unsupported by substantial evidence by the Court of International Trade? Yes. The Court found the finding on saw blade diameter was not supported by substantial evidence. What finding? What finding about saw blade diameter? The finding that the Court did not find them to be factually unsupported. The Court nonetheless used the language that each of them was unsupported. But the reasoning was, for instance, for the blade diameter, not that the record did not support our blade size difference finding. The Court said, and this is why we say the Court was reweighing, said the Commission had not shown how the overlap in the midsize range showed attenuated competition. There you go. And that is not what we were doing. Of course the overlap is not what showed attenuated competition. It limited competition. The overlap was where there may have been competition. There was also evidence supporting the blade size differences. The Court said it was not supported because in the midsize range, again reweighing to focus heavily on the midsize, in the midsize range the majority seemed to be all of blade types, seemed to be of the same blade type. They were all welded and segmented, or at least most of them. Pardon? Laser-welded and segmented. Laser-welded and segmented. But the evidence that there were differences was supported by substantial evidence. Differences? Between the concentrations of the subject imports generally and the concentrations of the domestic-like products, even though the majority of both across the spectrum were laser-welded, segmented, there was a significant share of the subject imports that were centered. So across the industry as a whole, across the market as a whole, the Commission reasonably found, based on substantial evidence, that this was a rational distinction. Within the midrange that the Court wanted to focus on, there was this distinction as well. The Court, however, simply found it wasn't supported because within the midrange the majority were of one type, ignoring that even in the midrange competition was limited by blade type differences. And then with respect to customers, the Court did... Are you talking again about the difference between centered blade type and centered blades and laser-welded segmented blades? Well, as we point out in our brief, even in the midrange, even looking at the table at page 16 of the first Court decision, you see that if you look between what the midrange is referred to as between 10 inches and 14 inches, you find that there continues to be differences in the blade type. When you say blade type, you're talking about centered versus laser-welded, right? Yes. Sometimes it's referred to as manufacturing process. So my point is, even if this Court were to focus, as did the lower Court, on simply the midrange, you would find that competition was further limited in the midrange itself by blade type differences. But I don't see that what the Court of International Trade is doing here is identifying specific findings that were wrong. It's just a question of emphasis. In other words, the Court of International Trade seems to be saying you should have paid more attention to the midrange blades where there's a lot of competition instead of to the lower end and the high end where there isn't that much competition. The Court of International Trade was not faulting, apart from the attenuated point, was not faulting a specific finding of the International Trade Commission. Am I mistaken? Well, first of all, the question was one of emphasis, and that is, of course, not the appropriate role for the Court of International Trade when applying the substantial evidence test. The Court did say that several findings were not supported. It said the findings based on diameter differences wasn't supported because it didn't explain the midrange. It said that the blade type differences isn't supported because within the midrange, viewed in isolation, the majority of both subject and domestic blades were of one type. But the narrowing of the competition is shown first by diameters, further by blade type, and further by customer types. The 75% of the domestic sales were to customers who were branded distributors. Well, where does he say that the diameter finding was wrong? That's at page 42. The Court finds that the Commission's conclusion of, again, based on blade diameter. Well, so that's not a finding that there was something wrong with a blade diameter finding. It's the conclusions that are drawn about competition from that. I couldn't agree with you more. And it's the Court's... Well, why didn't you argue it that way? Well, we do argue that the Court was engaging in a re-weighing of evidence when it was saying a decision, a determination wasn't, or a finding wasn't supported by substantial evidence. So we did, consistent with your question, Your Honor, we did say this is something other than applying the correct standard of review. I think we've run through your time, and I think we'd better hear from Mr. St. Charles. Thank you, Mr. St. Charles. Good morning. For the record, my name is Daniel Pickard of Wiley Rhine, here on behalf of the Diamond Saw Blade Manufacturers Coalition, a coalition of primarily small and medium-sized family manufacturers of U.S. diamond saw blades. I think as an initial matter, as to questions by this Court in regard to the difference between limited competition and attenuated competition misses the mark. The ultimate conclusion by the Commission was that there was no causal connection between the presence of the subject imports in the marketplace and the deteriorating performance of the domestic industry. And it's our position that that ultimate conclusion is both not supported by substantial evidence, but more importantly, the review of Judge Musgrave's opinion should be done under the abuse of discretion standard. There are certain facts that no parties can test here. There was a large increase in imports during the period of investigation. By value, they almost doubled. By the end of the period of investigation, three out of every four saw blades sold in the United States were from China or Korea. But what you basically got a finding by the ITC here is about a threat of future injury. And they're saying, here's the situation in the market today, and there's no present material injury, and that nobody's disputing that on appeal. So the question is whether the findings with respect to no threat of future injury in the first ITC determination are not supported by substantial evidence or are arbitrary and capricious. There seems to be a large judgment element. They go through the record, and they say, well, we don't think that the increasing volume is going to have a damaging effect because we think it's going to be in the same proportions, same parts of the market as before, and that there's not going to be an increasing volume in the larger saw blades and so on and so forth. And the question is, what's wrong with that? Well, one, that's not what the record showed. The record showed that subject saw blades, saw blades from China and Korea, were gaining market share in the small diameter, in the middle diameter, and in the large diameter. So that finding is not supported by the facts. What's most wrong with the Commission's statement? Did the Court of International Trade say that? It said it, and I think the ITC would concede that, and it's spelled out in the final determination affirming the ITC's commission or the ITC's injury determination. But the remand determination, when the Court of International Trade made the first remand, does it make a finding to the effect of what you just said? No. In the original determination, what the original decision by the Court of International Trade essentially says is, we can't understand how you get from this cited evidence to this conclusion. You cite a chart for the proposition that there's no causal competition, no causal connection, that there's no competition. But that chart shows that the majority of imports are in the same market segment. You're saying there's competition in the mid-range, and I find that more significant than the Commission did. No, no, I would respectfully disagree. I think what the Court said is that you're citing a chart that actually contradicts what you're saying. The Commission concludes that there's no causal connection whatsoever between the presence of growing imports, which are underselling the domestic industry, and the deteriorating— Where does he say that? Where does the Court say that? He says it at the end of his— Could you show me where? At the end of the first discussion discussing the Commission's conclusion in regard to— This is the sublate diameter discussion, right? Yeah, exactly.  The judge basically states for it, I don't understand, and I need more discussion, how you can cite the staff report that actually shows greater competition in the middle-sized ranges than the sublates sold in the smaller diameter for the proposition that there's a lack of causal connection. But he says that there's an attenuated competition. That's the phrase that he uses again and again and again. Which is ultimately attenuated competition or limited competition is the rationale that the ITC relies on to conclude— Well, there was limited competition, right? I mean, there wasn't competition across the whole range of the product. Well, and I think that's the bottom line. There's never perfect competition. Competitors never compete exactly the same way in a marketplace. What the ITC found was more than that, not differences in competition, but that there was such limited competition or such attenuated competition. They didn't use attenuated. They didn't say attenuated. That word does not appear in the ITC's decision, does it? No, what they say— Is that yes, it doesn't appear? I believe they used limited competition and— Is that correct that the word attenuated doesn't appear in the ITC decision? I'm not aware of the ITC using that word. But I think what's most important is on page 36 of their opinion, they say there's no causal nexus between the imports. That's beyond either limited competition or attenuated competition. There's no relationship by these vastly growing imports, which undersell the U.S. producers, that are competing primarily in the same heart of the industry and that are grabbing market share across the board as the financial performance of the domestic industry deteriorates over the period of investigation. Judge Musgrave said, when I look at these subsidiary findings, there's just a lack of discussion. I don't understand how you can get from a chart that shows they both compete in the heart of the marketplace for the proposition that there's no causal connection. So he's second-guessing them on causation. No, I think he said— But not on specific findings. No, I think he's basically pointing to their rationale and saying there's a lack of reasoned discussion. I don't understand how you can cite the differences between—or discussion of centered saw blades as being supportive of the connection that there's no competition between the majority of saw blades that are sold in the United States, which are laser-welded saw blades in the middle range. That doesn't further attenuate competition. That doesn't completely remove a causal connection. I don't understand how you can cite the fact that customers or distributors don't agree on who their ultimate customers are for the proposition that they sell to completely different bases. And I don't understand how you can do that by citing to producer and importer questionnaires for the proposition that distributors who don't agree on what a professional construction company is equals that they sell to different— So there's no determination by the Court of International Trade that any of the Commission's subsidiary findings lack substantial evidence. I believe that the ultimate findings that were made by Judge Musgrave  Answer my question. Did the Court of International Trade find that any of the Commission's subsidiary findings were not supported by substantial evidence? He found that—he used his language in regard to substantial evidence and a lack thereof in regard to the price effects and the competition analysis. But the Court over and over again, in probably 12 or 13 different places, says the failure is to provide a rational explanation, a discussion between the facts cited and the conclusions— So there isn't any—so he didn't find that they'd made a mistake in finding the facts. What he found was that there was a mistake in the conclusions that they drew from the facts. He found that there was a mistake in failing to provide a reasoned analysis, a failure to adequately explain, as required by law, how they reached conclusions based on facts that contradicted or were otherwise not supportive of the conclusions that they were cited for. I see that I only have a couple of seconds left. I would emphasize that from a common-sense point of view, if the ultimate question is whether the domestic industry is competing against imports, we would not be here today, after five years of litigation, asking for this remedy against unfairly priced imports. The very survival—it's not an overstatement—of the domestic companies depend on receiving this remedy against unfairly priced imports. Let me see if I understand. Oversimplify this and tell me if it's so oversimplified that it's distortive. But the essence of what I understand on the competition issue— and setting aside for a moment the limited versus attenuated competition point that Judge Dyck has referred to— the essence of what I understood Judge Musgrave to be saying is that the Commission bifurcated the analysis, characterized this market as having two components. Well, it doesn't have just two components. He says you look at the evidence that was before the Commission, which is the chart and other evidence. He says it has three components. And the middle range is a component in which, to all appearances, the arguments about factors that would limit competition are not present because the diameters are the same, by definition, in that middle range. The manufacturing process is the same, and there's no indication that the channels of distribution have an effect. At least in that range on competition. Is that a fair characterization of what Judge Musgrave views? I think that's essentially correct. I think he did more than that. I think what—the judge looked at a record that showed that there was competition in every diameter, every end user, every channel of distribution. Well, now, wait a minute. As far as the small diameter-centered saws, I didn't see him saying anything about there being significant competition in that range. No, he didn't. So go back to start. Well, if you go back to start, as far as kind of a historical— No, no, no. What I mean is you were telling me where my characterization was incorrect, and I thought you were beginning to say, well, Judge Musgrave found competition across the entire range. My understanding is he didn't find competition outside of the middle range in any significant degree. Well, I would be remiss if I didn't make an initial observation that the domestic industry has never looked at their decreased presence in small diameter saw blades as attenuation or limited competition, but rather a manifestation of continuing injury. It has always been our proposition that the domestic industry has been moved out of the small diameter saw blades. Well, okay, but this argument is one that we haven't seen anywhere in the case, as far as I can see. I think what he looked at is he said, look, you've got this artificial construct, very similar to what you said, and you've sliced and diced, and you said, well, there's— you, commission, have said there's attenuation here, and there's attenuation here, and there's attenuation here. But ultimately, the facts that you cite are not supportive of the propositions that you want.  You're saying that, you know, you concluded that there's no causal connection, yet the chart shows you guys are both concentrated in the same area. You're saying that you don't compete based on different manufacturing processes, but that doesn't further distinguish the heart of the industry, where everybody's competing. You cite that they're traveling through channels of distribution, but these artificial constructs in an attempt to segment the market, in reality, don't exist. But that sounds like a disagreement with the ultimate conclusion about causation. A couple of minutes ago, you were suggesting, I think, that his decision rested on sort of a state farm analysis, that they failed to take full account of the competition in the mid-range part of the market. I don't see his opinion as saying that it was a lack of explanation. I find his opinion suggesting a lack of substantial evidence. Am I wrong about that? I would respectfully submit that I don't read it the same way. I think that if you read— Well, where does he say that he's sending it back because there's a failure to provide an explanation? At the end of every issue that he sends back, he says that there's a failure to explain and there's a need to provide further discussion. As a matter of fact, when he characterizes his previous decision— Yeah, but every time he says that, he says there's a failure to show how— to explain how this shows attenuated competition. He's a failure to explain how the evidence cited is supportive of this proposition, right, that you need to provide more explanation. And even in his decision— And the proposition is attenuated competition, right? And it's various sub-findings, right? You find that there is attenuated competition on diameter, but the evidence you cite doesn't show that. You cite attenuated competition based on manufacturing process, but the evidence doesn't support that. To make sure I understand that we're all on the same page here, at least which pages each of us is on, you're using the word attenuated to mean the same thing as limited for purposes of this analysis. You're not understanding, I take it, Judge Musgrave, to be meaning anything different from what the commission meant when he says attenuated and they say limited. Is that correct? I don't believe that's a difference with a distinction, right, that limited or attenuated essentially, I think, are interchangeable. What's the ultimate error, right, is that these things were cited to say that there is literally no causal connection between their presence in the marketplace and the performance of the domestic industry and that their failure to provide, the commission's failure to provide, an adequate discussion is what requires the remand.  Thank you, Your Honor. We'll hear finally from Ms. Fox. Thank you, Your Honor. Lynn Fisher-Fox for Sangamon Abrasives. I just wanted to return briefly to the issue raised by Judge Dyke, and I think the question whether the term limited or attenuated competition and exactly what those words mean, what's clear... What's your view on that? What's that? What's your view on that? I think that Judge Dyke hit on a very important issue here. What's clear is that the CIT judge... Odd that none of the lawyers had hit on the issue. The CIT judge applied... I mean, this is the first time I'm hearing this from your side. I'm sorry, say that again. This whole business that there's a distinction between attenuation and limited, that hasn't been raised in any brief so far as I know, has it? I don't know. Technically, I'm not sure that I could define it. First, nobody raised this, right? No. Okay. So I'm saying... It's kind of odd to be now saying this is really an important issue unless you've just sort of learned something very important about the case in the last half hour. That's not what I meant to say. What I'm saying is I think Judge Dyke hit upon an issue that's important, which is that the CIT judge applied a different standard than the agency applied. The agency said there was limited competition. The CIT judge came in and he used the term attenuated, and no matter what word he used, it's clear that his standard for what that limit was was very different. In other words, assuming that attenuated and limited are not different, what he was reading the commission as saying is limited competition, meaning there's not very much competition, and he was saying that's not true. You can't say there's not very much competition because there's a lot of competition in the mid-range. Exactly. They looked at the market as a whole, which is what they were required to do by statute. They looked at the entire range of blades and said there's all these limiting factors on the competition, plus they also saw the impact on the industry and were able to see the limited effect that it had on the domestic industry. But he stepped in and said leave aside the small part and leave aside the big part. Look in the middle. Look, there's competition. I think there's competition. It's not enough for me that there's not competition here and there's not competition there. I need to look at this middle range, and I think this is enough to find there is competition. And that's the judge stepping into the shoes of the agency and basically making his own determination about what is a limited competition or what is an attenuated competition, no matter what word you use. He was applying a very different higher bar or lower bar, whichever direction you want to put the bar, for what amount of competition was enough to find that there was a limited impact from the imports on the domestic industry. I think you zeroed in on that in terms of it's clear that he's applying a very different yardstick than the agency, and it's not the CIT's job to go in and decide what the yardstick is. The CIT's job is to go in and decide whether the CIT or the ITC looked at the yardstick the right way, whether they held it upside down, not to figure out where the line on that yardstick is going to be. Would your position be the same if the evidence showed that only 10% of the market was in what we've been calling the small blades, and 10% was the 14-inch plus size blades, and 80% of the market, which the Commission didn't address, was in the 10 to 14-inch blades? That would depend on then what the other factors were. In this case, there wasn't just a size differential. There was a size differential. There was a type of blade. My hypothesis is that the Commission doesn't address anything about the 80% of the market that's in the mid-range, but simply focuses on the small and the large portions of the market, and says, well, we've looked at those two, and there's no competition of any significance. It didn't address the middle range at all? It didn't address the middle range at all. Well, I mean, that didn't happen in this case, so it's kind of a far-out hypothetical. So I don't really want to say what I would do, but it's a very different case. Well, I'm curious whether you think that that would be, because here what you've got is that there's a lot in the middle. It's not 80%. No, it's close to 50%. But there's a pretty good chunk, 50%. It's a pretty good chunk of the total market, don't you think? It's half of each, approximately half of each sides, if you want to call them sides, sales. But that doesn't mean that they're competing on 50%. I mean, as I think Mr. St. John's pointed out, there's a significant portion of those blades that are made by the Koreans, in particular, that are centered. Not in the mid-range, apparently. So far as we can tell, the mid-range, I thought it was pretty clear that in the mid-range, 10 to 14, virtually all of the blades were laser-welded and segmented. Is that not true? Because if it's not true, you may change it. I'm concerned. I'm not going to say a number because I cannot recall what's proprietary and what's not. But I think, especially if you go back and look at Mr. St. Charles's brief, he lays out what the number is, what the percentage of Korean production was in that mid-range that was centered, and it is not a small number. But I'm not going to say it in open court because I can't remember whether it's proprietary protected information or not. But I think it's in Mr. St. Charles's brief, and it is a not insignificant portion of the Korean imports. And then you have the sales to different producers. I mean, you can argue about the distributors, right? They're selling basically to different customers, which also, obviously, is a limit to competition. The CIT judge decided that that wasn't evidence enough for him of limited competition, but it was for the ITC. And I think that, again, going back to what the standard is, it's the agency that's the expert in this matter. It's the agency that sat through the hearing. It's the agency that was able to judge all the witnesses' credibility and determine whether there's that competition, and that's what they did. Now, I see my time is completely up. If you had one further point, we gave the other side a little extra time, so we'll give you a little extra time if you had one final point. Well, I think I was actually going to address what you said about the commission essentially bifurcated the analysis and the judge decided it should be cut into three, and I think we've already addressed that. But the issue isn't that you divide it into this, this, and this, and then look and see and find there's competition in the middle. They're required to look at the entire market. If they wanted to bifurcate it and sort of hive off part of it and decide that part didn't compete, they could have done that at the beginning of the case and only examined and only decided with regard to those limits for the size range. Thank you very much. We thank all counsel. The case is submitted.